IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.       )<br>)<br>MARCUS BROWN )<br>STEVE LAW, IV )  | Magistrate No. 20-2173<br>**[UNDER SEAL]** |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, Darcos Cruz, a Special Agent of the Federal Bureau of Investigation ("FBI"), United States Department of Justice, being first duly sworn, hereby depose and states as follows:

**I.    INTRODUCTION AND AGENT BACKGROUND**

1.    This Affidavit is made for the limited purpose of establishing probable cause in support of a Criminal Complaint that on or about October 27, 2020, in the Western District of Pennsylvania, Marcus BROWN ("BROWN") and Steve LAW, IV ("LAW") did knowingly, intentionally and unlawfully conspire with one another and with persons both known and unknown, to distribute and possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, and a quantity of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, contrary to the provisions of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B)(ii), and 841(b)(1)(C), and in violation of Title 21, United States Code, Section 846.

2.    I am an "Investigative or Law Enforcement Officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

3. I have been a Special Agent with the FBI since May 1, 2016. I received formal basic agent training at the FBI Academy located in Quantico, Virginia. I have been assigned to the FBI Pittsburgh Division since completing the FBI academy on September 22, 2016. Currently, I am a member of the Transnational Organized Crime Task Force. My current investigative duties include conducting investigations into drug trafficking organizations. Prior to my current assignment, I was assigned to the FBI Greater Pittsburgh Safe Streets Task Force from October 4, 2016 through October 31, 2019. During these assignments, I was responsible for conducting investigations into violent street gang members and large-scale drug trafficking organizations. Prior to that, I was employed as a Police Detective with the Miramar Police Department in Florida from October 30, 2008 to April 30, 2016.

4. During the course of my employment as an FBI Special Agent and Police Detective, I have participated in numerous complex criminal investigations. I have been involved in many narcotics-related arrests and the service of many narcotics-related search warrants. I have handled cooperating sources of information who were involved in narcotics acquisition and/or trafficking. In addition, I have been the Affiant in four previous Title III Affidavits and the lead case Agent in three previous Title III investigations. Therefore, I have reviewed thousands of communications between drug traffickers, and I have had hundreds of conversations with drug traffickers and users as well as with other law enforcement officers about the methods and language used by traffickers to smuggle, store, and distribute drugs, collect and launder drug proceeds, and avoid getting caught by law enforcement officers. Because of my narcotics-related training and knowledge, I am familiar with the methods and language used to distribute narcotics, to launder proceeds, and to operate drug-trafficking conspiracies.

5.      The investigations in which I have participated have resulted in the arrest and prosecution of individuals in state and federal court who have smuggled, received, and distributed controlled substances, including fentanyl, heroin, cocaine, and cocaine base. I have participated in many investigations and was the Affiant on prior court-authorized wire and/or electronic interception affidavits in the Western District of Pennsylvania.

6.      Based upon my training and experience, as well as the collective knowledge and experience of other agents and officers associated with this investigation, I am aware that it is generally a common practice for drug traffickers to store their drug inventory, drug paraphernalia, drug proceeds, and drug records at or in their residences (including garages and outbuildings), businesses, and vehicles, or at or in the residences, businesses, and vehicles of relatives or other trusted associates. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, and/or will be "fronted" controlled substances from their suppliers, record keeping is necessary to keep track of amounts paid and owed, and such records will be maintained close at hand so as to readily ascertain current balances and to keep track of how proceeds are being expended. Often, drug traffickers keep "pay and owe" records to document balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the traffickers' suppliers and the traffickers' distributors. Additionally, drug traffickers must maintain telephone listings of clients and suppliers to efficiently conduct their drug trafficking business. Such listings are frequently kept inside their cell phones or within their residences.

7.      Drug traffickers commonly use vehicles to move quantities of drugs and currency to other locations for storage and further distribution and use, and that drug traffickers often rent vehicles instead of using their own to prevent their own vehicles from being seized by law enforcement officials. They often swap vehicles with other conspirators, use vehicles with

dealer/interchangeable registration plates, use rental vehicles, use multiple vehicles, and use vehicles registered in names other than their own to frustrate law enforcement efforts.

8. Drug traffickers commonly possess and use multiple cell phones simultaneously to conduct their drug trafficking activities and must keep these phones in their actual (on their persons) or constructive (in their vehicles, residences, and businesses) possession to have ready access to them. This is so because drug traffickers often require the use of a telephone facility to negotiate times, places, schemes, cost, and manners for importing, possessing, concealing, and distributing controlled substances, and for arranging the laundering and concealment of proceeds derived from the sale of controlled substances. It is common for these cell phones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cell phones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using specific cell phones, it is far less common for drug traffickers to actually discard their cell phones after they switch to new cell phones. As a result, I am aware that collections of cell phones have been found during the execution of drug trafficking search warrants, including cell phones that were no longer being used by a particular drug trafficker, but had nevertheless been retained.

9. It is also a generally common practice for traffickers to conceal inside their residences or businesses or vehicles (particularly if they have a trap/hidden compartment), or inside the residences or businesses or vehicles of relatives or trusted associates, large sums of money, either the proceeds from drug sales or moneys to be used to purchase controlled substances. Drug traffickers often make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be

maintained in the residences, businesses, or vehicles of those involved in selling drugs or their relatives or trusted associates.

10. Drug traffickers often possess firearms, ammunition, and other dangerous weapons to protect their proceeds, product, and person from others who might attempt to rob them, and to enforce payment from their customers. Drug traffickers do not typically make police reports when they are robbed of their drugs or drug proceeds and they do not typically file lawsuits to recover unpaid drug debts. As a result, it is common for drug traffickers to arm themselves instead of calling the police or seeking legal recourse. And, because their drug trafficking activities are conducted over an extended period of time, drug traffickers possess firearms, ammunition, and other dangerous weapons for extended periods of time in convenient and safe locations, such as their residences, businesses, and vehicles.

11. When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement. In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found either inside the residence, business, or vehicle of the drug trafficker or inside the residence, business, or vehicle of the person in whose name the asset is listed.

12. I am aware that drug traffickers sometimes take trophy photographs of their drugs, drug proceeds, and firearms and retain the photographs in their residences or on their computers, cell phones, cameras, or other electronic storage devices. I am also aware that drug traffickers, like law-abiding citizens, sometimes take photographs of themselves with their friends, relatives,

and associates and keep the photographs in their residences. When they are taken or retained by drug traffickers, such photographs can be evidence, or can lead to evidence, of drug trafficking and money laundering by identifying closely associated people who are actively assisting and/or supporting the drug trafficking activity.

13. Drug traffickers often operate under assumed names to conceal their true identities from law enforcement officers. In so doing, they acquire property, services, and personal identification items (such as driver's licenses and birth certificates) under their assumed or alias names. They maintain such items, as well as records relating to such items, in their residences, businesses, and vehicles, together with evidence of their true identities.

14. Drug traffickers commonly conceal their activities from members of the public by transacting their business in a covert manner and/or during the nighttime hours when darkness helps to conceal their activities. In addition, large-scale drug traffickers often have multiple locations (including businesses, residences, and/or "stash houses") from which they operate their illegal activities and in which they maintain evidence of said illegal activities. Finally, it has become much more common for drug traffickers to utilize computers, cell phones, and/or other electronic media for communication and data-acquisition and data-retention purposes. It is now not uncommon for drug traffickers to have email accounts or various apps for cell phones that facilitate communications as well as the acquisition and expenditure of drug trafficking proceeds.

15. Evidence of drug crimes can be found in the cell phones/computers/electronic media referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, instant messages, or apps. It should be noted that, with the advance of technology, the distinction between computers and cell phones is quickly becoming less clear.

Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones. In addition, those involved in drug trafficking crimes commonly communicate using multiple cell phones. Contemporaneous possession of multiple cell phones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cell phones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

16.   As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally.

17.   Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

18.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is

overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

19.     My awareness of these drug trafficking practices, as well as my knowledge of drug use and distribution techniques as set forth in this Affidavit, arises from, among other things, the following:  a) my own involvement in this and prior drug investigations and searches during my career, as previously described; b) my involvement on a number of occasions in debriefing confidential informants and cooperating sources in prior drug investigations, as well as through information provided agents and police officers concerning the substance of their similar debriefings and the results of their own drug investigations; c) discussions with other federal, state, and local law enforcement officers, both about the facts of this case in particular and about trafficking in general; and d) the review of intercepted telephone communications between drug traffickers during which the traffickers have discussed the topics referenced herein.

20.     Based on the facts set forth in this Affidavit, I submit there is probable cause to believe that BROWN and LAW have committed violations of Title 21 Sections 841(a)(1),

841(b)(1)(B)(ii), 841(b)(1)(C), and 846, knowingly, intentionally, and unlawfully conspiring to distribute and possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, and a quantity of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance. Because this Affidavit is being submitted for the limited and specific purpose of establishing probable cause to support a Criminal Complaint, I have not included every fact known to law enforcement concerning this investigation. I have not, however, omitted any facts that would tend to defeat a finding of probable cause.

## II.   PROBABLE CAUSE

21. On October 26, 2020, members of the Pennsylvania State Police ("PSP") began following BROWN and LAW as they drove east with two females in a white 2018 Hyundai Elantra, bearing Pennsylvania registration LKP4916 and VIN number 5NPD84LF9JH252822 and registered to Marcus A. Brown at 141 Elm Street, Washington, Pennsylvania 15301 (hereinafter, "TARGET VEHICLE 1"). BROWN, LAW, and the two females arrived at the Hilton East New Brunswick hotel in New Brunswick, New Jersey on October 27, 2020. BROWN, LAW, and the two females checked into the hotel.

22. During the afternoon on October 27, 2020, BROWN, LAW, and the two females drove away from the hotel in TARGET VEHICLE 1. Investigators followed TARGET VEHICLE 1 directly to an apartment complex in Edison, New Jersey where TARGET VEHICLE 1 parked. Investigators observed a blue Chevrolet Impala, bearing New Jersey registration D93KUK (the "Chevrolet Impala"), parked a few spaces down from TARGET VEHICLE 1. Investigators observed BROWN and LAW at the front passenger's door of the Chevrolet Impala. Both BROWN and LAW appeared to be communicated with the driver of the Chevrolet Impala. LAW then took

9

possession of a black hard-sided suitcase from the Chevrolet Impala.  BROWN and LAW then travelled towards TARGET VEHICLE 1.  TARGET VEHICLE 1 and the Chevrolet Impala then drove away.  Investigators followed TARGET VEHICLE 1.  TARGET VEHICLE 1 then began travelling westbound towards the Western District of Pennsylvania.  Based upon my training, knowledge, and experience, I believe that BROWN and LAW's meeting at the Chevrolet Impala in New Jersey was consistent with a drug transaction.

23. Also on October 27, 2020, the Honorable Maureen P. Kelly, United States Magistrate Judge for the Western District of Pennsylvania, issued Warrants authorizing, inter alia, the search and seizure of TARGET VEHICLE 1.  *See* Mag. Nos. 20-2158 – 20-2169.  Investigators continued to follow BROWN, LAW, and the two females back towards the Western District of Pennsylvania in TARGET VEHICLE 1.  Contemporaneously, investigators travelled to BROWN's residence, located at 40 Lacock Hill, Washington, Pennsylvania 15301 to execute the search warrant on TARGET VEHICLE 1 upon its arrival.

24. At approximately 9:00 p.m., BROWN, LAW, and the two females arrived at BROWN's residence in TARGET VEHICLE 1.  BROWN was driving TARGET VEHICLE 1 and LAW was in the front passenger's seat.  Investigators attempted to detain BROWN and LAW.  BROWN and LAW ran from the area of TARGET VEHICLE 1.  As LAW ran from the area of TARGET VEHICLE 1, investigators observed LAW with a black and white backpack.  LAW threw the backpack and a cellular telephone.  Investigators detained LAW and BROWN.  Investigators then recovered the black and white backpack that LAW threw.  Investigators opened the backpack and discovered approximately 2 kilograms of suspected cocaine and approximately 43 bricks of suspected heroin.  Investigators then searched TARGET VEHICLE 1 and found the black hard-sided suitcase that LAW retrieved from the Chevrolet Impala with BROWN in the

trunk of TARGET VEHICLE 1. The black hard-sided suitcase was empty, but it did have white powder residue in it. Based upon my training, knowledge, and experience, I believe that BROWN and LAW obtained the suspected cocaine and heroin from the Chevrolet Impala in New Jersey in the black hard-sided suitcase. I further believe that BROWN and LAW then removed the suspected cocaine and heroin from the black hard-sided suitcase and placed it in the black and white backpack.

25. The approximately two kilograms of suspected cocaine and approximately 43 bricks of suspected heroin were transferred to the FBI's evidence control. Investigators field tested the suspected cocaine, which tested positive for cocaine, a Schedule II controlled substance. Investigators also weighed the cocaine, and the gross weight of the cocaine, including the packaging material, was 2.078 kilograms. Therefore, I believe that the total net weight of the cocaine, which does not include the weight of the packaging material, is at least 500 grams. I further believe that, based upon my training, knowledge, and experience, the possession of at least 500 grams of cocaine indicates an intent to distribute and not merely personal use.

26. Investigators did not field test the suspected heroin for safety reasons. However, based upon my training, knowledge, and experience, I know that one brick of heroin contains approximately one gram of heroin. Therefore, I believe that 43 bricks of heroin contain approximately 43 grams of heroin. I further believe that the possession of approximately 43 grams of heroin indicates an intent to distribute and not merely personal use.

### III. CONCLUSION

27. Based upon my training, knowledge, experience, and the foregoing facts, I believe probable cause exists that on or about October 27, 2020, in the Western District of Pennsylvania, BROWN and LAW did knowingly, intentionally and unlawfully conspire with one another and

with persons both known and unknown, to distribute and possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, and a quantity of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, contrary to the provisions of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B)(ii), and 841(b)(1)(C), and in violation of Title 21, United States Code, Section 846.

      The above information is true and correct to the best of my knowledge, information and belief.

                                              Respectfully submitted,

                                              *s/Darcos Cruz*
                                              DARCOS CRUZ
                                              Special Agent
                                              Federal Bureau of Investigation

      Sworn and subscribed before me, by telephone pursuant to Fed. R. Crim. P. 4.1(b)(2)(A), this 28th day of October, 2020.

                                              _____
                                              HONORABLE MAUREEN P. KELLY
                                              United States Magistrate Judge
                                              Western District of Pennsylvania